**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 4 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE GUARANTEE STATE BANK (JOE
BOB BABEK),

    Plaintiff-Appellant,

v.

FARM SERVICE AGENCY of the
UNITED STATES DEPARTMENT OF
AGRICULTURE,

    Defendant-Appellee.

No. 02-6127

(D.C. No. CIV-00-1726-F)
(W.D. Oklahoma)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **BRISCOE**, Circuit Judges, and **SHADUR,** District Judge.[**]

---

The Guarantee State Bank (Bank) appeals the district court's judgment affirming

the ruling of the National Appeals Division (NAD) which upheld the Farm Service

Agency's (FSA) decision to reduce its loan guarantee payments on two farm loans it had

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Milton I. Shadur, Senior District Judge, Northern District of
Illinois, sitting by designation.

guaranteed. We have jurisdiction pursuant to 7 U.S.C. § 6999[1] and 28 U.S.C. § 1291 and affirm.

## I.

In August 1997, the Bank and its borrower, Joe Bob Babek, submitted to the FSA a guaranteed loan application requesting loan guarantees for an operating loan and an operating line of credit. In October 1997, Babek signed promissory notes to the Bank and executed security instruments granting the Bank a security interest in collateral, including government payments, crops owned or thereafter acquired or grown, and proceeds from the sale of crops and crop losses.

In November 1997, the FSA guaranteed payment of a percentage of the operating loan and the operating line of credit. The guarantee agreements provided they were unenforceable by the Bank "to the extent any loss is occasioned by . . . negligent servicing." Suppl. App. at 80, 82 (defining "negligent servicing" as "failure to perform those services which a reasonably prudent lender would perform in servicing its own portfolio of loans that are not guaranteed"). Security requirements for the guaranteed loans included a lien on crops growing and grown in the 1998 crop year and all government payments received for the 1998 crop year. Babek used the guaranteed operating line of credit to plant his 1998 crops.

---

[1]Section 6999 provides: "A final determination of the [National Appeals] Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5."

In June 1998, the Bank learned that Babek had not been applying collateral proceeds to the operating line of credit. The Bank placed Babek's account in non-monetary default.[2] After calculating the amount of unreported collateral proceeds, the Bank notified Babek that he must apply those proceeds to the operating line of credit. Babek documented through receipts and checks that he had used the collateral proceeds for farm operating expenses. To cure the default on paper, the Bank entered the calculated amount of unreported collateral proceeds as a payment applied to the operating line of credit and on the same day reported the amount as an advance for farm operating expenses.

In December 1998, the Bank sent a letter to Babek, with a copy to the FSA, approving Babek's plan to liquidate real estate, farm machinery, automotive equipment, feed, and growing crops by public auction. The FSA's ag credit manager signed the plan of liquidation. In June 1999, the Bank and Babek entered into a loan compromise agreement. An FSA representative signed the agreement and certified that he was familiar with its contents and that the facts set forth in the agreement were true and correct to the best of his information. Pursuant to the agreement, the Bank agreed to release Babek from future liability for the promissory notes if Babek delivered to the

---

[2] Babek's failure to report income began seven months prior to the Bank's discovery of default. However, two months prior to placing the account in default, the Bank had reported to the FSA that all normal income from security was being properly accounted for and sales documented.

3

Bank the $24,437 he received as compensation for 1998 crop losses under the Crop Loss Disaster Assistance Program (CLDAP). When the Bank received the CLDAP proceeds, it applied the monies to other loans Babek had with the Bank that were not guaranteed by the FSA.

In April 1999, the Bank filed loss claims with the FSA for the guaranteed loans it had made to Babek. In October 1999, the FSA denied the claims in full after determining the Bank had been negligent in several instances in servicing Babek's account. Only two instances of negligent loan servicing are at issue in this appeal. The FSA concluded the Bank was negligent in servicing Babek's account by failing (1) to apply the $24,437 CLDAP payment to the guaranteed loans in order of lien priority, and (2) to account for $91,632.74 in income from sales of alfalfa hay. The Bank appealed the FSA's adverse decision to the NAD, which upheld the $24,437 and $91,632.74 deductions. The district court upheld the NAD ruling.

## II.

We apply the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701-706, in reviewing the final decision of a federal agency. We may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). "In reviewing the agency's decision, a court is not free to substitute its own judgment for that of the agency, but must instead uphold the agency decision if there

4

is a rational basis for that decision." Northwest Pipeline Corp. v. Federal Energy Regulatory Comm'n, 61 F.3d 1479, 1486 (10th Cir. 1995). "Although our inquiry into the basis of the agency's action will be searching and careful, our review is ultimately a narrow one." Maier v. EPA, 114 F.3d 1032, 1039 (10th Cir. 1997).

*$24,437 deduction*

The Bank asserts the ruling of the NAD which upheld the decision of the FSA to deduct $24,437 for the CLDAP payment is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and against the weight of the evidence. Specifically, the Bank asserts that by signing and approving the loan compromise agreement and the plan of liquidation, the FSA "modified the original terms of the loan agreements between the parties[,]" Aplt's Brief at 16, and "released [Babek] on all further obligations to account for or [turn over] collateral under the Security Agreement." Id. at 13–14.

The district court carefully considered the Bank's arguments and rejected them. The Bank's arguments erroneously assume that the FSA was a party to the loan compromise agreement or the plan of liquidation. Neither the loan compromise agreement nor the plan of liquidation names the FSA as a party or provides language expressly purporting to modify, alter, supercede, or rescind the terms of the guarantee contracts. Although signed by the FSA ag credit manager, the plan of liquidation does

5

not address either the release of Babek's future liability[3] or the disposition of future government payments for 1998 crops. The loan compromise agreement addresses the Bank's release of Babek from future liability. However, even if we assume through the certification attached to the loan compromise agreement that the FSA accepted its terms and conditions, the agreement does not contain language that constitutes a release or waiver by the FSA with respect to any of its claims against the Bank, including its right to have future government disaster payments applied to the guaranteed loans at issue. Moreover, nothing in the loan compromise agreement provides that the FSA is precluded from denying the Bank's loss claims based on negligent servicing of the loans. Although the FSA likely had knowledge of or even approved the terms and conditions of the loan compromise agreement, including the Bank's release of Babek from future liability, the Bank has failed to establish the FSA had any obligation to inform the Bank it was reserving the right to recover against the Bank for the $24,437 CLDAP payment. The loan compromise agreement was entered into between the Bank and Babek; it in no way altered the prior guarantee agreements entered into between the Bank and the FSA.

---

[3] At oral argument, the Bank argued that paragraph six of the December 31, 1998, letter specifically addresses Babek's release of future liability from the debt. Paragraph six provides: "The Bank intends to uphold its intentions with regard to remaining debt after liquidation assuming agreement to and performance of your Liquidation Plan." Suppl. App. at 306. Whether paragraph six is referring to a release from liability is nebulous at best. Even assuming the Bank is correct in its interpretation, paragraph six makes no reference to the FSA and specifically states that "[t]he Bank intends to uphold its intentions with regard to remaining debt after liquidation."

The Bank relies on several theories in support of its argument that the FSA modified the original loan agreements, including "equitable adjustment," "doctrine of superior knowledge," and "release and effectiveness of a settlement agreement." The theories of doctrine of superior knowledge and equitable adjustment are inapplicable in this case. The doctrine of superior knowledge applies to construction contract cases and dictates that "[a] contracting party that has superior knowledge about conditions that may impact the other party's use of a product or performance of a contract will have a 'duty to inform' that overrides any duty to inquire on the part of a contractor." 1 Bruner & O'Connor Construction Law § 3:25 (May 2002). Equitable adjustment, also a term employed in the field of construction law, is a form of damages similar to quantum meruit, "utilized to keep a contractor whole when the Government modifies the contract." 6 Bruner & O'Connor Construction Law § 19:50 (May 2002). The Bank's reliance on the release and effectiveness of settlement agreements is misplaced because, among other reasons, it presupposes that the Bank and the FSA entered into a subsequent contract modifying the original loan agreements.[4]

_____

[4] The FSA asserts that even if the Bank could demonstrate the FSA modified the original loan agreements, under applicable regulations, the ag credit manager "lack[ed] the authority to release [Babek] or collateral." Aple's Brief at 19. The district court's analysis of this issue is persuasive:

> There is really no need for the Court to get into the issue of whether [the ag credit manager] was authorized to waive or release the rights of the [FSA]. Suffice it to say here that even if those documents had been signed by the Secretary of Agriculture, they can have no legal effect beyond that which is set forth in black letters on white paper. The language of the

7

Title 7, Part 762 of the Code of Federal Regulations sets forth the regulations applicable to farm loans guaranteed by the FSA. Section 762.103(b)(2) provides that "[t]he loan guarantee cannot be enforced by the lender, regardless of when the Agency discovers the violation, to the extent that the loss is a result of . . . [n]egligent servicing." Section 762.102 defines negligent servicing as

> [t]he failure to perform those services which would be considered normal industry standards of loan management or failure to comply with any servicing requirement of this subpart or the lenders agreement or the guarantee. The term includes the concept of a failure to act or failure to act timely consistent with actions of a reasonable lender in loan making, servicing, and collection.

7 C.F.R. § 762.102. Section 762.142(a) sets forth the Bank's responsibilities regarding servicing of collateral. Subsection (a)(5) states that one of those responsibilities is to "[e]nsure the proceeds from the sale or other disposition of collateral are accounted for and applied in accordance with the lien priorities on which the guarantee is based or used for the purchase of replacement collateral."

One of the conditions of the guaranteed loans required the Bank to obtain first and second lien priorities on all government payments received for the 1998 planting and growing season. The $24,437 CLDAP payment was for 1998 crops. By not applying the $24,437 CLDAP payment to the guaranteed loans in order of lien priority, the Bank

---

documents simply does not have the effect contended for by the bank and the acting director quite properly resolved those issues against the bank. Suppl. App. at 575–76.

violated the conditions of the guarantees. The Bank's violation resulted in negligent servicing of the guaranteed loans. Section 762.149(i)(6) provides that "[t]he Agency will reduce a final loss claim based on its calculation of the dollar amount of loss caused by the lender's negligent servicing of the account." The loss caused by the Bank's negligent servicing was the amount of the deduction--$24,437. The NAD's determination upholding the FSA's decision to deduct $24,437 for the CLDAP payment was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to the law, and was supported by substantial evidence.

*$91,632.74 deduction*

The Bank further asserts the ruling of the NAD which upheld the FSA's $91,632.74 deduction is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and unsupported by substantial evidence. Specifically, the Bank asserts "[t]here is exhaustive evidence that [the Bank] and [Babek] correctly accounted for the alfalfa hay proceeds and the [NAD] decision is clearly against the weight of the evidence." Aplt's Brief at 16.

The Bank's contemporaneous canceling of credit and debits, no matter how correct, will not excuse the Bank's overall negligent servicing of Babek's account. The record reflects that from the date of the loan closing, the Bank failed to service Babek's account in accordance with the applicable loan note guarantee agreements, security instruments, and federal regulations. See 7 C.F.R. § 762.140(a)(1) ("Lenders are

9

responsible for servicing the entire loan in a reasonable and prudent manner."); 7 C.F.R. § 762.140(b)(2) (requiring lender to "ensur[e] borrower compliance with the covenants and provisions contained in the promissory note, loan agreement, mortgage, security instruments, any other agreements, and this part").

The record reflects that the Bank negligently serviced Babek's account by failing to ensure compliance with the applicable loan guarantee agreements, security instruments, and federal regulations. For example, the Bank and Babek agreed that all proceeds received from the sale of collateral would be presented to the Bank for payment on loans and the line of credit would "'zero out' in cash or inventory each 12 month period." Suppl. App. at 59. However, the record shows that Babek failed to present a substantial amount of collateral proceeds and the account did not "zero out" at any time. In addition, according to an analysis report completed by the Bank at the end of Babek's "normal operating cycle," approval was required by the FSA before the Bank could make advances for the second and third year on all operating line of credit loans. During the second year of Babek's operating line of credit loan, the Bank advanced $17,264 to Babek without the FSA's prior approval. Finally, the Bank failed to ensure that Babek complied with certain provisions in the security instruments; namely that Babek must provide the Bank with a schedule of proposed buyers prior to any sale of crops and then make all sale proceeds immediately available to the Bank. If the Bank had monitored and supervised Babek's account properly, the account could have been placed in default at an

earlier date, thereby ending Babek's use of the operating line of credit and reducing the FSA's loss. The loss caused by the Bank's negligent servicing was the amount of the deduction--$91,632.74. The ruling of the NAD which upheld the FSA's $91,632.74 deduction was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to the law, and was supported by substantial evidence.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

11